**EXPORT S. S. CORPORATION et al. v. AMERICAN INS. CO., NEWARK, N. J., et al.**

District Court, S. D. New York.
Dec. 17, 1938.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin and Frank J. Foley, both of New York City, of counsel), for libelants.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for respondent American Ins. Co., Newark, N. J.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Ira A. Campbell and Joseph F. Luley, both of New York City, of counsel), for respondent American S. S. Owners Mutual Protection & Indemnity Ass'n., Inc.

LEIBELL, District Judge.

Both respondent companies issued to the libelant, Export Steamship Corporation, which has been dissolved and whose successor is American Export Lines, Inc., protection and indemnity policies covering damage to cargoes carried by libelant's ships. Libelant was the owner of the steamship "Exmoor", a cargo vessel of the Hog Island type. The policy of The American Insurance Company, Newark, New Jersey, was for one year, expiring at noon February 20th, 1937. The policy of the American Steamship Owners Mutual Protection and Indemnity Association, Inc., picked up on that date and at that hour and covered the ensuing year. The Exmoor's eastbound voyage was uneventful and is not involved in this litigation. Her westbound voyage began at Constanza in the Black Sea. She loaded cargo at a number of ports in the Black Sea and in the Mediterranean on her voyage back to New York where she arrived March 12, 1937.

On January 17, 1937, the Exmoor was in the port of Chanak, Turkey. She took on a cargo of valonia which was stowed in the No. 2 and No. 4 lower holds. Valonia (vallonia) is the term used for the caps or cups of large acorns. When the acorn drops out it leaves the cup which is quite thick and has on its outer surface short spike-like growths. Valonia is high in tannin and is used in the tanning of leather. As shipped, the valonia was in second hand burlap bags, more or less stained, but presented a dry appearance externally. It was stowed in the after portion of the No. 2 hold to a depth of about three feet and in the forward portion of the No. 4 hold to a depth of about six feet. Some dunnage was put on top of this stow to level it off. Mats were spread over the valonia and around the battens, bulkheads and stanchions. The Exmoor proceeded to Dedeagatch, Greece, where, on January 19, 1937, she took on a cargo of tobacco. The tobacco, in burlap bales, was stowed on top of the valonia in both the No. 2 and No. 4 holds. The bales of tobacco were about twenty-eight inches long, sixteen inches wide and sixteen inches deep, slightly rounded at the corners.

On January 20th at Cavalla, Greece, another shipment of tobacco was taken aboard. Some of this tobacco was stowed on top of the Dedeagatch tobacco in both the No. 2 and No. 4 lower holds, and the remainder, a Norfolk consignment, was stowed in the bottom of said holds, separated from the valonia by a space of about six inches. This completed the stowage in the No. 4 lower hold.

On January 21st at Izmir, Turkey, another load of tobacco was taken aboard and was stowed on top of the Cavalla tobacco in the No. 2 lower hold. This completed the stowage in the No. 2 lower hold. After the completion of the stowage of the tobacco in the No. 4 lower hold at Cavalla and in the No. 2 lower hold at Izmir, the 'tweendeck hatch covers were put on. Some valonia was loaded and stowed 'tweendecks in holds No. 2 and No. 4 at Izmir. Some licorice root was also loaded

and stowed 'tweendecks in hold No. 4 at that port.

On January 23rd the Exmoor stranded on Cape Bianco and was not floated until January 28th. Thence she proceeded to Alexandria, Egypt, arriving there on February 1st. The Exmoor was in dry dock at Alexandria for repairs from February 1st until February 5th. She sailed from Alexandria February 10th and arrived at Alexandretta, Turkey, on February 14th. At Alexandretta bales of wool and skins were stowed in the 'tweendecks space of holds No. 2 and No. 4 which completed the stowing 'tweendecks for those holds. While loading the wool at Alexandretta a rain squall came up suddenly and the 'tweendeck hatch of No. 2 lower hold was removed to see if any of the rain reached the tobacco. There was no indication that it did, where examination was made in the immediate vicinity of the 'tweendeck hatch, so the hatch was again put in place and not removed until the Exmoor reached New York on March 12th. At Alexandretta the second officer entered the No. 4 lower hold through the manhole and crawled around on the top of the cargo of tobacco and did not detect any odors or notice anything out of the ordinary.

Leaving Alexandretta on February 14th the Exmoor arrived at Phillipeville, Algeria, on February 21st. While at Phillipeville she took on a deck load of cork and sailed for Casablanca, Morocco, where she arrived on February 25th and took on fuel oil. On the same day she sailed for New York arriving there on March 12th and immediately began to discharge cargo.

On opening the No. 2 and No. 4 lower holds on March 13th a large quantity of the tobacco stowed over the valonia was found to be seriously damaged by heating. The tobacco stowed alongside the valonia was damaged on the sides or ends of the bales adjacent to the valonia.

Liggett & Myers Tobacco Company and the Reynolds Tobacco Company, as owners of the damaged tobacco, brought suit against this libelant for failure to deliver the tobacco in good condition and the libelant answered and sought a limitation of liability. In the limitation of liability proceeding the tobacco companies filed claims. Finally, with the consent of these respondents, this libelant settled for $105,-000 the claims of the Liggett & Myers Tobacco Company and the Reynolds Tobacco Company filed in the limitation proceeding.

The details of the settlement and the consents thereto will be hereinafter discussed.

This present suit was begun by the shipowner to recover from its insurers the amounts paid in settlement of said claims and the necessary expenses incidental thereto. Respondent, The American Insurance Company, Newark, New Jersey, had issued a protection and indemnity insurance policy to the libelant on February 20, 1936, terminating on February 20, 1937, at noon Eastern Standard Time. The American Steamship Owners Mutual Protection and Indemnity Association, Inc., issued a similar insurance policy for protection and indemnity, with the risk attaching at noon Eastern Standard Time of February 20, 1937. The question presented by this litigation is which of the respondent insurance companies should reimburse libelant, or are both respondents liable and should libelant's damage be apportioned in some fixed percentage, each respondent paying libelant a certain allotted part of the damage.

Carver on Carriage of Goods by Sea, 7th Ed., Sec. 95, page 143, states: "95. The general responsibility at law of the shipowner makes him liable (where his liability rests on that basis) for any loss or damage which may happen to the goods in the ship's hold by their contact with, or proximity to, other parts of the cargo, or by any wasting or deterioration; unless, indeed, he can show that it altogether arose from some quality or defect of the goods themselves. It is not necessary that negligence in the manner of stowing the goods should be proved, or should have occurred, in fact. If the shipowner chooses to carry a number of different articles together, he does so at his own risk, and though he may have used all possible care in stowing them, he is liable for the damage they may cause to one another."

Valonia is a vegetable product valued for its high tannin content. Stevens on Stowage, page 768, says: "It (valonia) generates heat, and ships' beams have been burnt through by valonia stowed too green, as it then contains oil and is usually damp."

In Thomas on Stowage, page 250, it is said: "Valonia. The large acorn cups of a dwarf oak, exported from the Levant, etc., and used in the tanning industry. Very liable to heat and sweat; stow clear of fruit and other delicate goods liable to be affected by heat or moisture." And on

page 248 states that tobacco must be stowed "well clear of wet or moist goods, oils, strong smelling commodities and those that are liable to heat and sweat."

The moisture content of valonia is quite high, averaging from 9% to 13% on the outturn as received in this country. This particular cargo of valonia had a slightly higher moisture content on the outturn, a chemical analysis showing it to be over 14%. Tobacco is a delicate cargo with a great affinity for moisture. I find that the stowage of the tobacco over the valonia was improper and that this improper stowage was "the proximate cause, meaning the real efficient cause" of the damage to the tobacco. Lanasa Fruit Company S. S. Co. v. Insurance Company, 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422. The heating and fermentation in the tobacco caused by the natural moisture thrown off by the valonia was a continuing process. I find that the cause of the damage began operating a few days after the tobacco was stowed over the valonia and progressed steadily from that time until March 13th when the tobacco cargo was unloaded in New York.

The expert witnesses, who testified at the trial, were with one exception, in agreement that the stowage of a sensitive and delicate cargo such as tobacco, with a great proclivity for taking up moisture, over the valonia, a vegetable cargo with a natural tendency to heat and give off moisture, was an efficient cause of the damage to the tobacco. Practically all the experts agreed that the destructive process set up in the tobacco, by the communication to it of heat and moisture from the valonia, continued without interruption and was progressive from the time the damage began until the cargo was discharged in New York. Some of the experts testified that the valonia was the sole efficient cause of the damage; others thought that there were other contributing causes, although operating at a later date than the valonia. The principal alleged other cause was improper ventilation.

The valonia's guilt was clearly shown by the physical facts disclosed when the tobacco cargo was discharged in New York. The damage centered in two areas, one a circular area with a diameter of twelve to fifteen feet under the aft starboard corner of the No. 2 hatch and the other an area of fourteen to twenty feet under the forward port corner of the No. 4 hatch. In these areas there was a depression in the cargo of about three and a half feet. As the top bales were removed the condition of the bales grew steadily worse and the extent of the damage to the bales increased, until in the bales of tobacco closest to the valonia the heating and fermenting process had been operating so long that those bales were charred and hard. The worst and oldest damage was in the bales immediately above the valonia. The intermediate stage of the physical damage was found in bales that were hot, moist and fermented, but those bales were also worthless. A number of the bales had collapsed. Some of the bales in the Norfolk shipment, stowed alongside the valonia and within a few inches of it, were damaged at the ends of the bales that were immediately adjacent to the valonia. An examination of the bales after they were unloaded clearly proved that the damage was not what is known as "heart damage" i.e., damage starting from within the bales and working outwards. The testimony of the experts who examined the bales supports this conclusion.

Quite some testimony was offered at the trial in an effort to show that a large portion of the damage was caused by improper ventilation. Lack of ventilation was claimed to have been due to the deck cargo of cork taken on at Phillipeville on February 21st, 1937. The taller ventilators for the No. 2 and No. 4 lower holds extended above the deck cargo of cork, but the lower ventilators for those holds did not extend sufficiently above the cork to obtain the best results. But these ventilators were not so hemmed in that they could not be trimmed and they were trimmed whenever weather permitted on the voyage to New York. I find that improper ventilation did not cause the damage to the tobacco. Sweat damage, the usual type of damage resulting from improper ventilation, which causes the condensation of moisture on the ship's beams with the result that it drops on the stowed cargo, was so trifling in this case as to be practically negligible. Moreover, even had the ventilation been the best obtainable on this ship, the air would not have penetrated far enough down into the tobacco stow, where the heating damage was progressing, to have any substantial effect. Further, the evidence showed that only the tobacco stowed over or directly adjacent to the valonia was damaged, the remainder of the tobacco outturning in good condition.

There was some testimony at the trial that the ship's deep tanks were steamed out with live steam and that the oil put in the deep tanks at Alexandria was at a temperature of 92 degrees, from which it was argued that this might have caused the damage to the tobacco. I find that the steaming out of the deep tanks was done some time before any cargo was taken aboard for the westbound voyage and that the temperature of the oil in some of the drums that went into the starboard tank could not even remotely have had any effect on the tobacco. But the valonia did. And once the heating process from the valonia got under way, it was continuous. By February 20th, 1937, it must have done very substantial damages—how much no one can accurately state. There was no way to stop the damage, without discharging the cargo; and of course one would have to know that the damage was in progress before that remedy could be resorted to. The damage was not discovered until the ship reached New York.

■ Both of these policies of insurance were time policies. Ordinarily they cover only losses occurring during the period of the policy and "are conditioned upon the existence of the subject of insurance at the time the policies are written". Pendergast v. Globe & Rutgers Fire Ins. Co., 246 N.Y. 396, 399, 159 N.E. 183. Where losses will inevitably result after the expiration of the term of the policy from causes operating during the term, the indemnity covers all the loss, including that resulting after the term of the policy. Thus in marine policies it has been held that where a peril insured against has arisen during the term of the policy, setting certain causes in operation that result in a loss after the termination of the policy, the shipowner is nevertheless insured against the loss. Duncan v. Great Western Insurance Company, 1 Abb.Ct.App. Dec., N.Y., 562; Couch on Insurance, § 1213.

Similarly in fire insurance policies, where the fire starts before the expiration of the policy and continues after the term of the policy has ended, destroying property that was inevitably doomed during the term, it has been held that the insurance covers the entire loss. Globe & Rutgers Fire Insurance Company v. David Moffat Co., 2 Cir., 154 F. 13. See, also, Hartford Fire Ins. Co. v. Doll, 7 Cir., 23 F.2d 443, 56 A.L.R. 1059, and cases cited therein.

■ The first insurer's policy of insurance contains this statement: "The Assurers hereby undertake to make good to the Assured or the Assured's executors, administrators and/or successors all such loss and/or damage and/or expense as the Assured, without their privity or knowledge, shall as owners of the vessel named herein have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth." Among the risks listed in the policy there appears in paragraph 8: "Liability for loss of, or damage to, or in connection with the cargo or other property, excluding mail and parcel post, including baggage and personal effects of passengers, to be carried, carried, or which has been carried on board the vessel named herein." The letter of the first insurer, dated November 27, 1937, authorized the steamship company, the assured, to settle the claim of certain tobacco companies and conceded that the settlement "was a proper settlement of the liability of the S. S. Exmoor and The Export Steamship Corporation for damages to the cargo of tobacco, but without admission that such liability is recoverable under" the first insurer's policy. The liability settled by the insured fell within the class of risks described in paragraph 8 of the policy, "Liability for loss of, or damage to, or in connection with cargo", even though the insurer disclaimed liability under its policy. I fail to see how the first insurer can reasonably contend that the liability settled by the steamship company did not come within the class of risks insured against in its Protection and Indemnity policy.

■ If the shipowner were not covered by the first insurer's policy, I am of the opinion that the second insurer would be liable under its Protection and Indemnity policy. The scope of the protection and indemnity afforded the shipowner through his membership in the Association and under the By-Laws of the Association was no less than that received under the usual protection and indemnity policy issued by the first insurer. They were identical in many respects. The shipowner's application for membership and insurance in the American Steamship Owners Mutual Protection and Indemnity Association, Inc. states that it is in accordance with the By-Laws of the Association.

Article IX of the By-Laws is entitled "Protection and Indemnity Insurance".

Section 1 thereof provides: "Section 1. Each member of the Association shall be indemnified in connection with each steamship entered in the Association for Protection and Indemnity Insurance against any loss, damage or expense (not being the 'ordinary losses, damages or expenses' of the trade in which the entered steamship is employed) which the member shall become liable to pay and shall pay by reason of the fact that he is the owner of the entered steamship, subject to the provisions of these by-laws and the application for membership in the Association, and which shall result from the following liabilities, risks, events, occurrences and expenditures:"

Subsection 5 thereof provides in part: "Sub-Sec. 5. Liability for loss of or damage to or in connection with cargo or other property (except mail or parcels post), including baggage and personal effects of passengers, to be carried, carried or which has been carried on board an entered steamship; * * *"

A rider to the application states that "Claims under Sub-Section 5 are subject to a deduction of $2,000 with respect to each cargo carried", and the liability of the Association is further limited in respect to a certain amount per package shipped or unit of cargo shipped in bulk.

██ The bills of lading in this case cover the shipment of goods by sea to ports of the United States and are subject to the provisions of the Carriage of Goods by Sea Act, Title 46 U.S.C.A. § 1300 et seq. Under § 1303(2) of the statute it is provided: "The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." Any exceptions in the bill of lading that conflict with that provision of the statute are of no effect. A failure to deliver the cargo in good order and condition, unless the damage to the cargo was caused by a legally excepted risk, express or implied, imposed liability on the shipowner, subject to such limitations as are provided by statute. The shipowner in this case was itself sued by the cargo owners and had claims asserted against it in the Limitation of Liability proceeding based on its failure to deliver the cargo in good order and condition.

██ The bills of lading were also subject to the provisions of the Harter Act, Title 46 U.S.C.A. §§ 190, 191. Any stipulation in the bill of lading relieving the shipowner from liability for negligent stowage would be null and void.

██ It has been held in a number of cases that there is no warranty of seaworthiness, implied or express, in connection with a protection and indemnity policy. Sorensen v. Boston Ins. Co., 4 Cir., 20 F.2d 640; Hanover Fire Ins. Co. v. Merchants' Transp. Co., 9 Cir., 15 F.2d 946. The following quotation from George A. Moore & Co. v. Eagle Star & British Dominions Co. Inc., D.C., 5 F.2d 358, at page 361, is in point: "The respondents contracted to insure, protect, and indemnify, 'if the assured shall become liable to pay and shall pay any sum or sums in respect of any responsibility claim, demand, damages and/or expenses, or shall incur any other loss.' The enumerated perils include, 'loss or damage to any goods which may arise from any cause whatever.' Without going into the origin and purpose of P. & I. coverage, and avoiding any elaborate comparison of such a policy with an ordinary marine insurance policy, I think that for the purpose of this decision it is sufficient to point out that if a warranty of seaworthiness was implied into this policy, it would mean that in practically every instance the insurance company had assumed no risk, because, generally speaking, a ship is not liable to the cargo unless it is unseaworthy. Under the Harter Act, the ship is not liable to the cargo unless (1) it fails in proper loading, stowage, custody, or care of cargo; or (2) unless it is unseaworthy. Cargo improperly loaded, stowed, or ventilated, as a matter of law, renders the vessel unseaworthy. Obviously such a construction is to be avoided; otherwise, libelant would have paid premiums to no avail. Even if it be true that cargo claims form but a small part of a P. & I. coverage, the same reasoning applies, because it must be assumed that a proportionate part of the premium is paid to cover each specified risk. We should go far to avoid a construction which would render this particular clause meaningless." Affirmed 9 Cir., 9 F.2d 296.

██ The cargo owners could legally hold the shipowner liable for the failure to deliver the tobacco in good order and condition, that is for delivering the tobacco in a damaged condition caused by the improper stowage of the tobacco over the valonia. I am of the opinion that the shipowner could in turn hold the second insurer under its Protection and Indemnity policy.

But since the first insurer's policy was in effect when the heat and moisture from the valonia set in operation in the tobacco the forces and agencies described by the experts that began damaging the tobacco and resulted in its ruin for commercial purposes—forces that started to operate within a few days after the stowage and continued to spread without interruption until the discharge of the tobacco in New York—the first insurer must bear the entire loss.

The contention has been made that the damage should be apportioned between the respondents and testimony was offered in support of an apportionment on certain percentages. I am of the opinion that an apportionment is not legally permissible in this case. The Supreme Court of the United States in the case of Howard F. Ins. Co. v. Norwich & N. Y. Transportation Co., 12 Wall. 194, 20 L.Ed. 378, approved the rules for apportionment set forth in Phillips on Insurance, Vol. 1, §§ 1136, 1137, as follows [page 196]:

" 'In case of the concurrence of two causes of loss, one at the risk of the assured and the other insured against, or one insured against by A., and the other by B., if the damage by the perils respectively can be discriminated each party must bear its proportion.' * * *

"Where different parties, whether the assured and the underwriter, or different underwriters, are responsible for different causes of loss, and the damage by each cannot be distinguished, the party responsible for the predominating efficient cause, or that by which the operation of the other is directly occasioned, as being merely incidental to it, is liable to bear the loss."

In 1 Phillips Ins., 3d Ed., 684, 686, it is said: "If certain consequences would inevitably result after the expiration of the period of the policy from the operations of the perils insured against during the period they are surely proper subjects of indemnity."

The basis for apportionment under those rules and certain cases granting apportionment is the operation of two distinct causes resulting in the loss. In the case at bar, in my opinion, there was but one cause of loss—the stowage of the tobacco over the valonia. For "negligent stowage, or failure to care for the cargo properly during the voyage" the carrier is liable. Schnell v. The Vallescura, 293 U.

S. 296, 305, 55 S.Ct. 194, 197, 79 L.Ed. 373. If there had been two causes contributing to the damage, I should feel bound to attempt an apportionment of the loss. And if the figures of the experts as to the percentages of the loss assignable to the different causes were found too speculative to be of any value, the admiralty rule of dividing the damages could be applied. The Georgian, 5 Cir., 76 F.2d 550, 551.

The first insurer (The American Insurance Company, Newark, New Jersey) argues that the cargo claims which the libelant shipowner settled were for failure to deliver the tobacco in good order and condition, that this failure to deliver occurred in March when the Exmoor arrived in the United States, that the liability on these claims accrued at that time, after the expiration of the policy of the first insurer and while the policy of the second insurer (American Steamship Owners Protection and Indemnity Association, Inc.) was in effect, and that therefore the first insurer is not liable but the second insurer is.

One answer to this argument is found in the terms stated in the letters of November 27th, 1937, written by both insurers to The Export Steamship Corporation at the time it was negotiating with Liggett & Myers Tobacco Co., Inc., and R. J. Reynolds Tobacco Co. for a settlement of their respective claims asserted in the proceedings for limitation of liability "for damage to tobacco on the voyage of the S. S. Exmoor which terminated on or about March 12, 1937". According to said letters the settlement was to be "for such sums as may be approved by" the insurers, and without prejudice to the rights of the respective insurers and subject to the terms and conditions of their Protection and Indemnity policies, except that the insurers admitted "that the settlement was a proper settlement of the liability of the S. S. Exmoor and The Export Steamship Corporation for damage to the cargo of tobacco but without admission that such liability is recoverable under" their respective Protection and Indemnity policies. The insurers further agreed in said letters that if the steamship company sued them in the same suit in admiralty they would not raise any objection to being joined in the one suit and each insurer waived presentation of claim and proof of loss. To its letter the second insurer added the following paragraph: "It is understood that if such suit is brought by The Export Steamship Cor-

poration against the American Insurance Company and the American Steamship Owners Mutual Protection and Indemnity Association, Inc., The Export Steamship Corporation will produce and offer in evidence the stowage plan and the log books of the ship and will call as witnesses the master, the chief officer and such other witnesses as are necessary or desirable fairly to prove the stowage of the cargo, the movements of the ship, the events of the voyage, the general condition of the cargo at discharge and other material facts concerning the damage to the tobacco."

 Although the tobacco companies in their libel actions and in their claims in the Limitation Proceedings apparently based their rights to recover on the failure to deliver the tobacco in the designated United States ports in good order and condition as shipped and asserted that their claims accrued as of the dates of said delivery, I am of the opinion that this in itself should not fix the liability on the second insurer under its Protection and Indemnity policy, if in fact the first insurer was liable to reimburse the shipowner for the loss under its Protection and Indemnity policy. It seems to me that it would be unjust and a dangerous precedent to permit the nature or basis of the remedy sought by the cargo owner against the steamship company to determine the liability of the insurer, where the cargo owner has a choice of remedies or several grounds on which to base his claim, some in tort and some on contract. Any such course might lead to collusion or technical evasion and either leave the insured without any protection under its policy, or in the case of two insurers enable one to unjustly saddle the other with the liability to reimburse the insured.

The stowage of the tobacco over the valonia was improper stowage and at the time it was thus stowed there was a breach of libelant's contractual obligation (The Delaware v. Oregon Iron Co., 14 Wall. 579, 20 L.Ed. 779; St. Johns N. F. Shipbuilding Corp. v. S. A. Companhia Geral, etc., 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201) and statutory duty (46 U.S.C.A. § 1303) to properly load and stow the cargo. The steamship company became liable for the damage resulting from the improper stowage at the time of said stowage, although the resulting damage was neither known nor ascertainable or was only nominal at that time. In my opinion the time of the breach, in respect to stowage, determines when the liability first attached in this case. If there had been no breach at the time of stowage there would have been no breach at the time of delivery.

The claims of the tobacco cargo owners were settled by the libelant steamship company for $105,000, after authorization and approval of the amount by both respondent insurers. In addition, libelant has been put to certain expense for which claim is made in the libel herein. Libelant did not undertake to prove damages at the trial, awaiting the entry of a decree and the appointment of a commissioner to determine the amount of libelant's damage, in the event that the parties cannot agree on the amount.

The libel is sustained against respondent, The American Insurance Company, Newark, New Jersey, and the libelant is entitled to a decree against said respondent for the whole amount of libelant's damages, the amount thereof to be fixed by a commissioner to be named in the decree.

The libel is dismissed against respondent, American Steamship Owners Protection and Indemnity Association, Inc.

This opinion contains the Court's findings of fact and conclusions of law. Submit decree on notice.