**THE MANGALIA et al.**

District Court, S. D. New York.
Oct. 16, 1946.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Eugene P. McCue, both of New York City, of counsel), for libellants.

Duncan & Mount, of New York City (Frank A. Bull and Daniel Huttenbrauck, both of New York City, of counsel), for claimant-respondents.

HULBERT, District Judge.

Nine libellants filed four suits in Admiralty to recover damages alleged to have been sustained to various shipments of fur skins laden aboard the M/S Mangalia at Constanza, Roumania, on April 22nd and/or 23, 1940, in apparent good order, arriving at New York on or about June 2, 1940, and there delivered to the consignees about June 6, 1940.

The first libel (Ad. 121—87) was filed June 13, 1940, by six libellants to whom were delivered the following:

Alfred Fuchs
  15 bales Lambskins
  Marked: H L F 90/104

These were sold by Al Fuchs Co. to libellant Seifter Fur Co.

I. Fineberg & Co. Inc.
  9 bales Lambskins
  Marked: I F (or J F) 77/8ɔ
  6 bales Lambskins
  Marked: J F 138/43

J. Wagner & Neuman
  7 bales Lambskins
  Marked: W N 130/136

J. Cohen & Son Fur Co.
  11 bales Lambskins
  Marked: C S 150/160

M. Aronin & Sons
  19 bales Lambskins
  Marked: M A 65/76   105/107   120/124

The second libel (Ad. 121—94) was filed June 14, 1940, by Kestenbaum Brothers, to whom was delivered:

  6 bales Lambskins
  Marked: K B 144/49

The third libel (Ad. 121—101) was filed June 17, 1940, by Max Segal, to whom was delivered:

  6 Bales Lambskins
  Marked: M S 111/116

The fourth libel (Ad. 121—239) was filed Aug. 21, 1940, by Mano Hoffner Fur Corp. Inc., to whom was delivered:

  6 bales various fur skins
  Marked:    S S 125/129 & 137
  95 bales various fur skins
  Marked: F S K 36/130

The vessel, being within the jurisdiction of this court, was attached and the proctors for the libellants immediately proceeded to take the deposition of the Master on June 14, 1940.

The claimant, the Kingdom of Roumania, appearing specially, filed a claim of immunity and a motion to dismiss; this was supplemented by A Suggestion of Immunity interposed by the United States District Attorney for the Southern District of New York, and such proceedings were had that a reference was made to a Commissioner, who reported adversely to the claimant, and said report was confirmed by an order of this court December 18, 1941, pursuant to which the respondent joined issue by the service of its answers in the first three respective causes on January 30, 1942, and in the Hoffner case on February 4, 1942.

Thereafter the trial of these cases was stayed owing to the existence of a state of War and did not come on for trial until June 10, 1946.

The M/S Mangalia was a newly constructed vessel built for and owned by the Roumanian Government and was making her maiden voyage across the Atlantic; it was also the first Transatlantic crossing made by the Master.

Jack Bluestein, whose deposition was taken shortly before, and read by libellants at the trial, testified that he now resides in Brooklyn, New York, but was born in Bessarabia, then a part of Russia, and had been in the fur business since he was 15 or 16 years old. He came to the United States in 1920 and, for nine years, was engaged in the fur business here; he returned to Roumania to buy on his own account, but in 1937, 1938 and 1939, he also bought for other people, and in the spring of 1940 had instructions from libellants Aronin to buy for them. This he did from various people who had bought them from trappers and breeders. The skins which he purchased were baled up and brought to his headquarters warehouse in Cernauti; there he opened and inspected them and those acceptable were rebaled when ready to be shipped.

In February or March 1940, he bought the merchandise in question. The skins were put up in 19 bales, about 200 or 300 skins to a bale, of which 12 bales were Gray, and 7 bales were Black Persian Lamb of all sizes.

Cernauti was a night's ride by train from Chisinau, a distance of 200 to 250 Kilometers. The 19 bales were taken to the train at Cernauti and by train to Chisinau, and then by horse and cart to the Roumanian Government warehouse a "15 minute" drive. The bales were thrown off the cart right into the building where they were reopened and examined by customs officials, graded out and appraised, and sealed by employees of the Roumanian Government, which was interested in getting American dollars for their product, lambskins being one of the principal exports of the country. The original sellers were paid in American dollars and the purchase payments went through the National Bank of Roumania. The 19 bales were delivered out of the warehouse the next day by Government employees onto railroad cars in a train which left that night for Constanza, the port at which the merchandise was loaded aboard the M/S Mangalia.

The train brought the cargo onto the pier; a representative of Bluestein rode on the train to guard the consignment, and Bluestein travelled on a later train by a shorter route arriving in Constanza at about the same time. He was present on the day when the 19 bales were transferred to the ship's hold by the ship's tackle, and he testified that the bales were in good condition, not wet or damp, and it was a clear, dry day. None of these bales were ever reopened before sailing after customs inspection. The customs house employees marked the bales:

"MA 65/76; 105/107 and 120/124."

There is no such specific testimony with respect to the other consignments but the skins all originated in the same territory and a reasonable deduction from the evidence is that they were baled and transported and laden aboard ship in substantially the same manner and all of the several shipments to the libellants herein were stowed in the lower No. 2 hold, mixed together.

They were out-turned at a covered pier in Brooklyn, New York, in a damaged condition. The draymen refused to accept them without having a notation made on the receipt delivered to the ship, which contained the following notations: and other fur skins, but explained that the unloading was under the supervision of the Chief Officer. However, he was informed immediately after the taking of the skins from the ship that suit had been filed to recover damage by water, and after

| Date: | Consignee | Marks | Condition |
|---|---|---|---|
| 6/5 | HLF (Fuchs) | 90/104 | Wet stained; subject examination |
| 6/5 | IF (Feinberg) | 77/85 | Covers wet |
| 6/5 | JF (Feinberg) | 138/43 | Covers wet |
| 6/5 | Wn (Wagner) | 130/136 | Covers wet |
| 6/5 | CS (Cohen) | 150/60 | Wet stained; subject examination |
| 6/5 | MA (Aronin) | 65/76 105/7 120/121 124 | Covers wet |
| 6/5 | KB (Kestenbaum) | 144/9 | Wet stained; subject examination |
| 6/5 | MS (Seigal) | 111/116 | Wet stained; subject examination |
| 6/6 | SS (Hoffner) | 125/9 137 | All wet stained; subject examination |
| 6/19 | FSK (Hoffner) | 36/129 | 64 bales—Old covering; Torn; Contents exposed |
| 6/19 | FSK (Hoffner) | 36/129 | 28 bales; Old covering Torn; Contents exposed |
| 6/7 | FSK (Hoffner) | 54, 77 | 2 bales; None |
| 6/7 | FSK (Hoffner) | 130 | 1 bale—Resealed |
| 6/7 | FSK (Hoffner) | 200 | Case resealed |
| 6/6 | FSK (Hoffner) | 201 | Recoopered cover Subject examination |

These latter two items are not involved in this suit. Also

| 6/5 | DW | 108/10 | Covers wet |
| 6/6 | HW | 1/149 | 20 wet stained 1 cover torn Subject examination |
| 6/5 | AV | 117/119 | Wet stained Subject examination |

When the Master was examined on June 14, 1940, he admitted he was aware that the vessel brought a number of shipments of lambskins, hareskins and rabbit skins he had been told by the Chief Officer there was "something abnormal" he went into the No. 2 hold to examine the space where the cargo of skins had been stowed. He

found the floor and the wooden battens, which covered the skin of the ship, dry. He then looked over the entire group of cargo on the pier, without moving anything, but he made no physical inspection except, as he said, he touched a few rabbit skins which were exposed, but as he had "no idea at that time what the extent of damage was" he did not make a detailed examination in order to verify it; that in looking at the bales piled up on the pier he observed that the burlap was old and dirty and it was almost impossible to note any spots. He further stated that *at the time of loading,* if any of the cargo had been damaged, when received by the ship, notation would have been made on the embarkation slip, and there was no such notation.

As a matter of fact, he admitted that *at the dock in New York* the burlap was old and dirty and "dusty from the graineries and so on from the moment it was put on the ship at the port of embarkation, and when it was taken off the ship there was no way of knowing one spot from another," and he "didn't try to distinguish between one spot and another;" he discussed the claim of damage with a representative—a skin expert of a cargo interest and with Mr. Baker the surveyor representing the ship, but thereafter he did not go on the pier and make any further examination of the skins.

The Chief Officer also testified that when the skins were loaded the bales were dusty.

The testimony in this case also discloses that from 6,000 to 7,000 bags of Valonia cups were taken on board at Odunluk, April 25-27. Some of this cargo was stored in the No. 2 hold and some in the No. 2 'tween deck under the No. 2 hatch. It was stowed "from the forward end of the hold—on top of the bales of skins—until about three quarters towards the back end of the hold." (Dep.C.O. page 13). Some 3,000 bags of Valonia were loaded in the No. 2 hold at Ceanakale.

The Master testified that after the vessel had left the port of Naples the Valonia which was in the No. 2 'tween deck was shifted by the crew to one of the after holds.

It is very clear from the testimony that some of these bags of Valonia were wetted when transferred from shore to the ship, which was anchored some distance off, and stowed in No. 2 hold, and a portion of Valonia was stowed over the bales of skins which, the Captain testified, may have touched the forward steel bulkhead of No. 2 hold. Valonia is known to have a high moisture content.

The Master testified that the Chief Officer inspected the cargo in transit in accordance with the usual custom but "because of the nature of the cargo, which demanded more care, I also personally inspected the lower No. 2 hold." ( P. 33).

When the vessel left the shipyard it carried ballast which had not been removed because the vessel discharged cargo at intermediate ports before it began the Transatlantic crossing. The evidence is that the cargo occupied about 50% capacity. Moreover, there were no dunnage boards laid under the bales of skins, for which no adequate explanation was given.

■ The conclusion of the court is, that if the bales, or burlap covering the bales of skins, were dusty at the time of delivery to the vessel, and were not protected by dunnage, the inference must necessarily be drawn that the damage complained of resulted from improper stowage of the Valonia, as well as *improper ventilation.* The respondent has not shown there was no other space available for the stowage of the Valonia and skins in separate compartments and the evidence tends to establish the fact to be to the contrary.

■ The nature of Valonia requires that care and good judgment must be used in *stowing it. Consideration should be given* to the type of cargo with which it is stowed. In Export S. S. Corporation et al. v. American Ins. Co. Newark, N.J., et al, D.C., 26 F.Supp. 79 (reversed on other grounds, 2 Cir., 106 F.2d 9), my colleague, Judge Leibell, had occasion to discuss the nature and stowage of Valonia and, while the product damaged there was tobacco, this court is satisfied that the stowage of Valonia with fur skins was improper. As already indicated, some of the bags of Valonia had been wetted before being laden aboard, and this condition, together with the natural moisture given off by Valonia,

should have caused the stowage of Valonia and fur skins to be avoided, if possible, or at least in a manner which would have afforded complete protection to the skins.

There is evidence in this case that insufficient steps were taken to augment the ventilation afforded the No. 2 hold by the ship's ventilators. In Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 196, 79 L.Ed. 373, the court was concerned with a cargo of onions and it was held that the evidence supported a finding that failure to provide proper ventilation was the cause of some of the damage to the cargo, and that seems evident here. But the instant case does not stand or fall on the question of ventilation alone.

 From the evidence presented, this court is satisfied that the fur skins when delivered to the ship were in apparent good order and when delivered in New York were in a damaged condition. The burden which the law imposes on the carrier of goods to explain the damage or bring himself within an exception which would excuse him, has not been met in this case. In speaking of this burden, the court in Schnell v. The Vallescura, supra, said:

"He is a bailee entrusted with the shipper's goods, with respect to the care and safe delivery of which the law imposes upon him an extraordinary duty. Discharge of the duty is peculiarly within his control. All the facts and circumstances upon which he may rely to relieve him of that duty are peculiarly within his knowledge and usually unknown to the shipper. In consequence, the law casts upon him the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability."

In The Asturias, D.C., 40 F.Supp. 168, affirmed Wessels et al. v. The Asturias, 2 Cir., 126 F.2d 999, this court pointed out at page 173, of 40 F.Supp.: "It is the duty of the carrier under the General Maritime Law, when the cargo is not delivered in the like order as received, to show affirmatively that the damage arose from an excepted peril."

The answers to the libels herein admit that the bales in question were in apparent good condition when received aboard the M/S Mangalia. There exists adequate proof by the libellants that the contents of the bales were in good condition when received aboard. This is true with respect to the M. Aronin shipment and it can reasonably be inferred from the evidence that the other shipments were in like good condition when placed on board.

The answers also assert that any damage to the shipments referred to in the libels would render the Mangalia not responsible under subsections (i), (m) and (q) of subsection (2) of section 4 of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304 (2). As pointed out in The S/S Asturias, supra, the shipper has the burden of proof under subdivisions (a) to (p) but the burden is on the carrier as to subdivision (q).

Upon all the evidence presented, my conclusion is that the shippers have met the burden so imposed upon them and the claimant has not discharged its burden of establishing that its actual fault or privity or neglect of its agents or servants did not contribute to the damage sustained.

Unless the parties agree upon the amount of the damage there will be an interlocutory decree for the libellants.