**UNITED STATES of America, Plaintiff-Appellant,**

v.

**LYKES BROS. STEAMSHIP CO., INC., in personam, and SS MARJORIE LYKES, her engines, tackle, etc., in rem, Defendants-Appellees.**

No. 72–1633.

United States Court of Appeals, Fifth Circuit.

April 9, 1975.

Anthony J. P. Farris, U. S. Atty., B. Stephen Rice, James Gough, Asst. U. S. Attys., Houston, Tex., Anthony W. Gross, Dept. of Justice, Admiralty & Shipping Section, Walter H. Fleischer, Ronald R. Glancz, Morton Hollander, Appellate Sec., Civ. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Kenneth D. Kuykendall, George W. Renaudin, Houston, Tex., for defendants-appellees.

Before BROWN, Chief Judge, and WISDOM and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This appeal presents the troublesome and recurring and sometimes confusing problem of properly allocating the burden of proof between Shipper and Carrier in a suit for damages to perishable cargo. The United States (Shipper) brought suit to recover for damage to a shipment of whole wheat flour transported by Lykes (Carrier) from Houston,

Texas, to Gdynia, Poland.[1] Upon out-turn in Poland, the flour was totally in-fested by weevils—one of the species bears the name of confused flour bee-tle—and was rejected as unfit for hu-man consumption. Damage to the cargo amounted to $21,751.78. The District Court in a non-jury trial found the Government failed to discharge its bur-den of proving the cargo was delivered to the defendant in actual good order and condition and thereupon dismissed the complaint. We conclude the District Court misconstrued Carrier's obligation to Shipper. Therefore, we vacate and remand for further consideration not in-consistent with this opinion.

### All Weevils On Board

In attempting to sustain its burden of proving the nine rail carloads of whole wheat flour (8,332 100-pound bags) were delivered to Carrier in good order and condition, the Government presented a detailed description of the milling and transportation processes. A clear under-standing of that procedure is helpful to our review of the District Court's factual findings as to the cause and origin of the weevil infestation.[2]

The flour was milled by the Kimbell Diamond Milling Company in its Texas mills, three rail carloads at Graham, and six at Seguin. Under the standard prac-tice, when the wheat arrived at the mills, it was initially placed either in a storage tank or an elevator, where it was fumigated.[3] The grain was then run through a series of separators and screeners to remove foreign matter. Then it was milled and mechanically

1. The flour under transport to Poland was for the use of CARE, Inc., a relief agency of the United States Government.

2. Dr. Lyman S. Henderson, Chief of the Stored Products Insect Research Branch of the Department of Agriculture's Research Service, testified at the trial as to the various species of weevils which infest whole wheat flour and the different life stages in which they may be found. Some of the more preva-lent beetle species that can infest common grain products, such as whole wheat flour, include the confused flour beetle, red flour beetle, saw tooth grain beetle, cigarette beetle and the lesser grain bore. All these varieties will be grouped under the common name "weevil" for our discussion. The lesser grain bore feeds both on the whole grain and on milled products. The other species prefer milled products, although they may be found in stored grain feeding on broken kernels and grain dust.

Dr. Henderson stated the life cycle for the different species is very similar, all evolving within four weeks under good conditions. Good conditions include temperatures from about 80 to 90 degrees Fahrenheit and about 60% relative humidity. He also said many of the insects do very well at higher tempera-tures or humidities. He described the insect's life cycle as follows:

A The typical life cycle for this group of insects is that the adult lays eggs which hatch within, again a general matter of two or three days to a week. This will vary with temperature and moisture, humidity conditions.

The larvae stage is next, what hatches out of the egg. They are very small at first. As they grow and become larger, they at periodic intervals shed their skins and molt. They become again larger. They run through a succession of these stages, four or five, maybe more.

This, again, varies a little bit with the species, but within this group that we are speaking of and under favorable conditions, this larvae stage will last maybe two to three weeks.

When the larvae is full grown, it trans-forms into pupa, p-u-p-a. It develops into a pupa which is a resting stage. It does not feed, is not active or mobile.

It lasts for, again, three to five or six days, something like that.

 \* \* \* \* \* \*

And when this is completed, then the adult form begins to take shape and when the process is through, the adult insect emerges.

Q Is there any further growth as an adult?

A No. Once an insect is an adult, it's reached its full size.

Dr. Henderson stated the confused flour beetle is the only one which does not fly. It spreads primarily by crawling or by being moved with the commodity or food material in which it is living. The red flour beetle, cigarette beetle and lesser grain bore are all strong fliers. These flying abilities make pre-venting infestation more difficult.

3. The Graham mill fumigated with cyanide gas, the Seguin mill with a phototoxin. At trial, Dr. Henderson (see note 2, *supra*) testi-fied either method is an accepted mill proce-dure for destroying live infestation.

packed in cotton bags. While the flour was being bagged, Government inspectors took samples which were analyzed by local Department of Agriculture laboratories for evidence of filth or insect fragments.[4] The Commodity Inspection Certificates issued by the laboratories for all nine carloads showed no findings of insect fragments or other filth.

The bagged flour was loaded into rail cars.[5] The cars were sealed with masking tape, fumigated by introducing methyl bromide through a hole, which then was itself Government sealed. The Graham mill used 15 to 20 pounds of methyl bromide per rail car, the Seguin mill used 18 pounds. On direct examination, Dr. Henderson testified fumigation with 15 to 20 pounds of methyl bromide per car would be adequate to kill all stages of infestation in flour. But when pressed by defense counsel to state 15 to 20 pounds would kill 100% of each stage, Dr. Henderson equivocated by saying he did not want to give an exact answer because there are too many other factors affecting infestation, such as the seal on the doors and outside temperature.

James S. Cook, a defense witness, was not so equivocal. An entymologist and former employee of the Department of Agriculture Research Service, he testified a 15 to 18 pound dose of methyl bromide would kill insects in each stage, "but it is not adequate to kill all insects in all stages throughout the car." Asked what conditions would be required to kill 100% of all stages of all insects, he described the necessity for almost ideal conditions and an average dose of 27 pounds per car.[6]

### Carrier's Custody

The carloads of flour arrived at the Port of Houston on May 26, May 27, June 7, and June 8, 1965. Wharf receipts prepared by Carrier reflect that six of the nine carloads were found to be infested upon opening in Houston. Those cars were then fumigated a second time.

Prior to loading, SS MARJORIE LYKES was inspected by a member of the Houston Merchants Exchange and a certificate was issued stating the vessel's holds were free of live infestation. On June 13 and 14 all the flour was loaded into the ship's No. 4 lower hold. A clean bill of lading was issued by Carrier on June 14.

4. Additional samples are sent to the Department's laboratory in Beltsville, Maryland. There was no report of contamination in either the Graham or Seguin cargoes.

5. Prior to loading, each rail car was thoroughly cleaned, coated with a contact spray and examined by mill personnel to ensure its good condition.

6. A This approaches an uneconomical level and this would mean that the car must be selected. Most standards that a flour mill can accept a car on for loading and shipping flour is not adequate for a 100 percent control.

So, there are not very many cars adapted to this.

Secondly, we would have to go to much—the cars would have to have—excuse me—the load would have to be palletized within the car to assure complete distribution; the gas would have to be introduced either as a hot gas or as a fine spray, possibly with fanning inside; it would have to be sealed far more extensively than it is now.

The odds are it would actually have to be covered and enclosed within a nylon or vinyl coated gas-proof tarpon—I don't know—the car would not be able to move from its location during the entire exposure period of not less than 24 or 45 hours.

To assure ourselves this is proper, we would have to run an analysis within the car and watch this concentration as it builds up or as it dissipates from the car.

Q How many pounds of methyl bromide would it take to insure this 100 percent kill, assuming all of these other conditions that you have mentioned?

A We would have to be sure we maintained that concentration and I imagine we would have to start between five and eight pounds per thousand cubic feet, an average car contains approximately 4,000 cubic feet.

We're talking in the ranges of 20 to 30 pounds.

Q Is there any way to be a little more precise with respect to how many pounds or can you just give the general ranges?

A Because we are going after 100 percent control, if we are to compare it to other species of insects, we would have an average of about 27 pounds per car to obtain 100 percent kill throughout the load on all stages.

While still in Houston, 714 bags of milo (animal feed) were stowed in the No. 4 hold, directly on top of the flour cargo. Only large sheets of cardboard, separated the cargoes.[7]

The District Court based its critical finding that the Government failed to "discharge its burden of demonstrating actual good order and condition of the cargo upon its arrival in Houston" on both the expert witnesses' testimony and the infestation found in the rail cars. The Court found (i) there had not been a 100% kill, (ii) live eggs therefore infested the flour when delivered to Lykes, and (iii) they constituted an inherent vice in the cargo.

### The Strike Delay

SS MARJORIE LYKES departed Houston at 0500 hours June 15, 1965 and arrived in Beaumont at 1900 hours that evening. Additional cargo was to be loaded in Beaumont, and later in other Gulf ports. At midnight on June 15, the Marine Engineers Beneficial Association declared a strike which prevented the ship from departing Beaumont.[8] The strike lasted until August 28, 1965 and SS MARJORIE LYKES remained strike bound in Beaumont until September 8. Subsequently she loaded more Cargo in New Orleans and Mobile, and finally arrived in Gdynia, Poland October 13, 1965.

### Discovery Of Infestation

While the SS MARJORIE LYKES was idle in Beaumont, a shore-based inspector was employed to check the ship's mooring lines and cargo. The inspector, John Young, testified that he checked the vessel's holds every 7 to 10 days during the strike. On August 19, 1965 he discovered the flour cargo in hold No. 4 was infested with live weevils. Young notified an official of Carrier on August 19, but no attempt to notify Shipper was made until August 26.

Even then, Carrier merely sent a letter, notifying Shipper of the discovery of weevil infestation and requesting instructions. Shipper did not respond, but Carrier decided to fumigate the shipment anyway. A second letter was sent on August 31 to notify Shipper of that decision. Finally, on September 6 the cargo was fumigated.

The District Court found Carrier's care of the cargo was not free from negligence. From the testimony, the Court found Young actually entered hold No. 4 only once, on August 19, when he discovered the live weevil infestation. It was negligent of Carrier to fail to notify CARE, Inc. until 7 days had passed, and then only by letter through the regular mails. The Court found Carrier compounded its negligence by failing to fumigate the cargo until September 6, 18 days after the initial discovery of infestation.

### Discharge Of The Flour In Poland

One day prior to departing Beaumont on September 8, 1965, a portion of the milo cargo was discharged from hold No. 4 due to dampness acquired during the vessel's stay in Beaumont. When the flour cargo was discharged in Gdynia, from October 13 to 15, 1965, inspectors for both Carrier and Shipper examined the flour and found it was infested and unfit for human consumption.[9] The en-

7. Asked about the possible consequences of this arrangement, Dr. Henderson responded in part:

A Well, I think it's rather traditional that all the people who have to do with this handling and movement of animal feed are paying less attention to critical insect control than are those who are involved with food products.

There is a tendency to be a little more lax in your control measures with animal feeds and be a little bit neglectful.

8. Shipper does not dispute the District Court's finding that no culpable act or omission by Carrier contributed to the outbreak of the strike.

9. The two inspectors' reports, filed with the Polish Chamber of Foreign Trade, showed the cargo was contaminated with living insects. On discharge several of the bags were found to have been damaged by wetness and there was an odor of fermentation about the cargo. Baking the flour produced a bread which was bitter and had breaking gluten.

tire cargo was rejected by Shipper and sold as animal fodder. The Shipper's loss totaled $21,751.78.

### District Court Findings Of Fact And Conclusions Of Law

The District Court made four critical findings of fact: (i) Shipper failed to establish the actual good order and condition of the cargo upon its arrival in Houston; (ii) there was insufficient evidence to show what part of the infestation, if any, occurred because of the milo's proximity to the flour; (iii) Carrier adequately brought itself within the strike exception to liability provided in COGSA § 4(2)(j), 46 U.S.C.A. § 1304(2)(j); and (iv) the Carrier failed to demonstrate its freedom from negligence in caring for the cargo.

The District Court isolated Shipper's failure to establish actual good order and condition of the cargo at the time of delivery to Carrier as the fatal element in its claim. It held Shipper's failure to discharge that burden of proof defeated any prima facie case and, therefore, precluded any recovery.

### Burden Of Proof

Modern disputes over ocean-going freight are governed by COGSA, 46 U.S.C.A. § 1300 et seq. A Shipper complaining of cargo-damage must prove delivery in good order and condition, and outturn by the vessel in damaged condition to make out a prima facie case. Zack Metal Co. v. S. S. Birmingham City, 2 Cir., 1962, 311 F.2d 334, 337, 1962 A.M.C. 925; Daido Line v. Thomas P. Gonzalez Corp., 9 Cir., 1962, 299 F.2d 669, 671, 1962 A.M.C. 1299. As an initial step in demonstrating good order and condition Shipper relied on the clean bill of lading issued by Carrier. But a clean bill of lading merely attests to apparent good condition of cargo, based on external inspection. In Compagnie de Navigation v. Mondial United Corp., 5 Cir.,

1963, 316 F.2d 163, 170, 1963 A.M.C. 946, 951, we held, "[w]here because of the perishable or intrinsic nature of the commodity, the internal condition is not adequately revealed by external appearances, cargo may have a considerable burden of going further to prove actual condition."

While standing by the clean bill of lading, Shipper admitted, indeed was forced to admit, due to the discovery of infestation in the rail cars at Houston that flour tends to become infested if not cared for properly. Although not admitting to any inherent vice or defect theory, the Government took this position in attempting to bolster its showing of good order and condition, contending that all flour will become infested if not fumigated at regular intervals. Therefore, the Government contends, the condition of the flour when delivered to Carrier was as good as could be required.

Although the record fully supports a finding that infestation is inherent in flour, in various stages of incubation and propagation, and that proper handling can contain it, we think the District Court meant to go further. We interpret its conclusion "that the Government has failed to demonstrate the actual good order and condition of the cargo upon its arrival in Houston . . .", as supported by its statement that "there is strong evidence to indicate that the cargo was already infested at the time of its delivery to defendant. . .", to mean the flour was in such a condition that normal precautions would not be enough to preserve the cargo's "as delivered" condition.[10]

The case is, therefore, distinguishable from United States v. Central Gulf S. S. Corp., 5 Cir., 1972, 456 F.2d 1281, where the District Court found the flour cargo *was* in good condition and order.

We hold, therefore, the District Court correctly concluded Shipper failed

---

**10.** Our inference arises from the fact the supporting statement (quoted in the text) is in the context of a paragraph holding that, absent special instructions, Shipper is not entitled to special treatment. We discuss this rule further, p. 224, *infra,* but point it out now for its value as an interpretative aid.

**224**

to make out a prima facie case. However, we do not agree that ends the matter. It simply means Shipper cannot rely on the difference between the cargo's condition when delivered to Carrier and that at outturn to discharge its burden of proof.

■ COGSA § 3(2), 46 U.S.C.A. § 1303(2) obligates Carrier to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." [11] There is nothing in the statute which relieves that obligation. COGSA § 4, 46 U.S.C.A. § 1304, enumerates various instances in which carriers are not liable to their shippers, but none of them excuses the carrier from the duty imposed by § 3. Shipper's failure to make out a prima facie case, however, imposes upon it the burden of proving any damage to the cargo resulted from a breach of that duty. Further, we affirm the District Court's holding that Shipper was entitled to no more in the way of cargo-care than the shipper of any other load of flour. *Cf.* Aunt Mid, Inc. v. Fjell-Oranje Lines, 7 Cir., 1972, 458 F.2d 712.

■ The District Court *did* find "[Carrier] has failed to demonstrate its freedom from negligence in caring for the cargo." [12] And it found "defendant has sufficiently shown itself entitled to claim the strike exception of [COGSA § 4(2)(j)] 46 U.S.C. § 1304 [(2)(j)] . . ." Both findings are supported by the record, but we need to discuss their consequences because we hold, *supra*, failure of Shipper's prima facie case does not warrant dismissing its complaint.

■ Two arguments cut against Carrier's assertion that its eligibility for the strike clause exception totally relieves it of liability in this case. First, the preamble to § 4(2) states "the ship shall

[not] be responsible for loss or damage arising or resulting *from*—. . ." strikes (emphasis added). Second, the proviso to § 4(2)(j) is "[t]hat nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts . . . ." Taken together, we think it is clear the strike clause only relieves the carrier of its obligation to care for cargo to the extent the strike makes it unreasonably difficult to continue doing so. Schroeder Bros., Inc. v. The Saturnia, 2 Cir., 1955, 226 F.2d 147.

■ At a minimum, we think that continuing obligation includes, in the case of flour cargo during that time of year conducive to insect growth,[13] the duty to inspect the cargo from time to time—unless, of course, the strike makes such inspection unreasonably difficult. The cost of inspection is slight—we do not believe it requires any special talent—yet the likelihood of a large loss is substantial, regardless of the flour's condition when delivered to Carrier. In this case Shipper recognized that obligation and took some steps toward discharging it.

If in exercising this minimal care infestation is discovered, as it was in this case, a different problem arises. Complete resolution of it requires knowledge of facts the District Court did not believe itself required to have under its analysis. On a factual record the Court must find several things. First, it should determine what a reasonably prudent carrier in the exercise of its § 3(2) duty should do with respect to anticipating the likely existence of insects and the steps reasonably necessary to eliminate or alleviate damage therefrom. Second, it should determine whether an inspector, reasonably instructed as to what to look for, should have discovered

**11.** In this respect it echoes the earlier Harter Act, 46 U.S.C.A. §§ 190–196.

**12.** This finding is supported by the record, regardless of which party ought to be charged with the burden of proof on the issue. Therefore, insofar as the District Court's finding might be read, as containing a legal conclu-

sion that Carrier was under such burden, we should not be understood as either rejecting or sustaining it.

**13.** *See*, United States v. Central Gulf S. S. Corp., 5 Cir., 1972, 456 F.2d 1281; and United States Shipping Board v. Texas Star Flour Mills, 5 Cir., 1926, 12 F.2d 9.

the infestation earlier than Inspector Young did in this case. Third, the Court should determine in the light of a factual record what a reasonable, prudent carrier, discharging its § 3(2) duty, would have done once it knew of the infestation, and at the time it should have known of it. Fourth, Shipper is obligated to prove, by a preponderance of the evidence, what damage was actually caused *beyond* that which would have resulted from the defective condition existing in the flour at the time of its delivery to Carrier. The fourth inquiry should be made in the context of the rule stated by the District Court, and affirmed by us, that Carrier (assuming a strike-less voyage) was not obligated to provide onboard treatment beyond the normal stowage due a shipper with flour in actual "best-possible" condition who does not specify special treatment.

Neither should the District Court feel obligated to reconsider its ruling on Carrier's eligibility for the strike exception. Thus, the fourth inquiry should include a determination of whether or not *any* reasonably feasible treatment would have saved the cargo, given both the strike and the delivery-condition.

Without meaning to limit the District Court's third inquiry on remand, by way of illustration we point out three alternatives Shipper faced had it been immediately advised of the infestation. It could have (i) ignored the situation, hoping to salvage enough of the cargo to make that the most economical alternative, (ii) fumigated the cargo,[14] or (iii) unloaded the cargo and attempted to sell it immediately.[15] Throughout the inquiry, the Court should keep in mind that Carrier's decision is to be reviewed in light of the circumstances as they reasonably appeared at the time—not with the benefit of hindsight.

Vacated and remanded.

---

14. In connection with this option, it will, of course, be necessary to consider who would bear the burden of paying for any fumigation. There is the factor of whether the cost of fumigation should reasonably be placed on Carrier or Shipper. For the District Court's guidance, without anticipating this decision, we think it appropriate to bear in mind that the fumigation we refer to is confined to that required by an event (strike delay) for which Carrier has a conditional relief from responsibility under COGSA § 4(2)(j).

15. We do not doubt that circumstances may arise when the master of a ship has not merely the authority but, under § 3(2) of COGSA, the duty to sell cargo that is at risk of further deterioration, communicating with the owner if that is feasible but still having both the authority and duty if it is not.

Lekas & Drivas, Inc. v. Goulandris, 2 Cir., 1962, 306 F.2d 426.