**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

**v.**

**M/V FRIO BRAZIL, her engine, tackle, and furnishings In Rem; Lomar Shipping, Ltd., her charterer, a foreign corporation; and Seabridge Shipping, Ltd., her owner, a foreign corporation, In Personam, Defendants.**

No. 88–936–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Jan. 16, 1990.

G.J. Rod Sullivan, Jr., Jacksonville, Fla., for plaintiff.

Robert E. Warren, Taylor, Moseley & Joyner, Jacksonville, Fla., for defendants.

## ORDER

G. KENDALL SHARP, District Judge.

This action, tried before the court without a jury on October 12, 13, and 16, 1989, involves a shipment of frozen orange juice concentrate that was damaged en route to Port Canaveral, Florida. Coca–Cola Company (Coca–Cola) purchased the frozen orange juice concentrate from Sucocitrico Cutrale, S.A., (Cutrale), a Brazilian orange juice processing company. The M/V Frio Brazil, a defendant in this action, is a refrigerated cargo vessel that transported the concentrate from Santos, Brazil, to Port Canaveral, Florida. Lomar Shipping, Ltd., another defendant, chartered and operated the M/V Frio Brazil on this voyage. Seabridge Shipping, Ltd., yet another defendant, owned the M/V Frio Brazil and leased it to Lomar Shipping for this voyage. The Insurance Company of North America (INA), plaintiff, insured the shipment for Coca–Cola against loss and damage. INA possesses subrogation rights to Coca–Cola's claim against the defendants for the damage to the frozen orange juice concentrate.

Based on the testimony and evidence admitted at trial and the facts admitted in the joint pre-trial stipulation, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. Findings of Fact

Cutrale has been processing frozen orange juice concentrate since 1979 and has been using its current facility in Colina, Brazil, since 1985. To process concentrate, Cutrale extracts juice from the oranges, evaporates the water from the juice, and captures the orange fragrance. The fragrance is called orange waterphase or orange oilphase. It is either frozen and stored separately or mixed back into the raw concentrate to form finished concentrate. Finished concentrate is packaged into tetrapacks. Tetrapacks are patented

paper liquid storage containers. The remaining raw concentrate is poured into drums. Both finished and raw concentrate are frozen and stored in refrigerated warehouses in Colina until they are exported.

Raw concentrate, finished concentrate, orange waterphase and orange oilphase all have different freezing temperatures. Because much of the water has been removed from concentrated orange juice, it contains a higher percentage of solids and freezes at a lower temperature than reconstituted or fresh juice. Raw concentrate freezes at − 9 to − 10 degrees centigrade. Finished concentrate freezes at − 18 degrees centigrade. Although raw concentrate contains more dissolved solids than finished concentrate, finished concentrate must be kept colder to preserve the flavor of orange juice and maintain the rigidity of the paper containers. Frozen orange juice concentrate can be stored for two years at these temperatures without suffering temperature abuse. In contrast, non-concentrate fruit juice contains very little solid matter and, therefore, freezes at − 2 degrees centigrade. Similarly, orange waterphase and orange oilphase freeze at − 2 degrees centigrade.

In this case, Cutrale produced two shipments of concentrate for Coca–Cola. The first shipment was destined for Port Canaveral, Florida (the Port Canaveral shipment) and the second for Wilmington, Delaware (the Wilmington shipment). The Port Canaveral shipment was marketed under three labels: Minute Maid, Sunfilled, and Minute Maid Margate (Margate). The Wilmington shipment was also marketed under three labels: Minute Maid, Sunfilled, and Sunshine.

Before exporting the concentrate, Cutrale conducted separation, gel, flavor, and light transmission laboratory tests of the Minute Maid and Margate concentrate for the Port Canaveral shipment. The Minute

Maid and Margate concentrate received the highest possible scores in the flavor and gel tests and passed the separation and light transmission tests. (Plaintiff's Ex. 7). These test results indicated that the concentrate had been sufficiently cooled to retard enzyme activity.[1]

After testing, Cutrale packaged the Port Canaveral and Wilmington shipments. The Port Canaveral shipment was made up of 273,600 tetrapacks in 22,800 cartons, twelve to a carton, placed on 304 pallets. (Plaintiff's Exs. 2 & 3). The Wilmington shipment consisted of 72,000 tetrapacks in 6,000 cartons on 80 pallets. The Port Canaveral and Wilmington shipments were then placed on standard european pallets which measured forty-two inches by fifty inches. Cardboard squares covered the top and bottom layers of the cartons. Plastic bands held the cartons on each pallet, encircling the cartons on top and the pallet on the bottom. Two sets of three bands each ran perpendicular to one another. Cutrale regularly uses this packaging system. Cutrale also uses another system in which a cardboard shroud completely encloses all of the cartons on the pallet. Cutrale has used cardboard shrouds on past shipments to Coca–Cola, but has never had a problem with either pallet packaging system since it began shipping tetrapacks.[2]

The pallets containing the Port Canaveral and Wilmington shipments were then placed in a refrigerated warehouse at the Colina plant and remained there for at least five days. (Plaintiff's Exs. 2 & 3). The pallets were single-stacked, that is, the pallets were not placed on top of one another. The median temperature of the ambient air inside the Colina warehouse during this time was − 24 degrees centigrade. (Plaintiff's Ex. 2). Although no one measured the actual temperature of this shipment, the temperature of concentrate stored in

---

1. Enzymes are a chemical in orange juice concentrate that, if stimulated, destroy the flavor and consistency of the juice. Although enzymes are always present in concentrate, cold temperatures retard enzyme activity so that the concentrate remains fresh. Freezing finished concentrate to − 18 degrees centigrade retards enzyme activity. In addition, the effects of enzyme activity are cumulative and irreversible, although

concentrate previously exposed to heat may be refrozen, the enzyme activity that occurred during the exposure to heat will still affect the flavor of the orange juice.

2. In 1987 alone, Cutrale shipped 390,000 cartons of tetrapacks on 5,200 pallets without incident.

the Colina warehouse usually ranges between − 18 and − 24 degrees centigrade.

Between January 7 and 13, 1988, the Port Canaveral and Wilmington shipments were transported from Colina to a deep water port at Santos, Brazil. (Plaintiff's Exs. 2 & 3). Santos is approximately 500 kilometers from Colina; the entire trip took eleven to twelve hours. Cutrale transported the Port Canaveral and Wilmington shipments in the same manner that it transported all of its shipments to Santos. Cutrale loaded the pallets onto flatbed trucks, twenty pallets per truck, single-stacked. They were packed tightly together so that the cartons formed a block, exposing only a small amount of surface area to the surrounding air. Cutrale covered all of the cartons with a canvas tarpaulin. Although no one measured the temperature of the Port Canaveral or Wilmington shipments in Santos, the temperature of concentrate normally rises only one to two degrees centigrade during the trip.

All of the pallets from both shipments arrived in good shape and were double-stacked in refrigerated warehouse D at Cutrale's facility in Santos. (Plaintiff's Ex. 9). The refrigeration unit operated during the day, when the doors were periodically open, but not at night, when the doors were always closed. Cutrale continually recorded the ambient air temperature in warehouse D. (Plaintiff's Ex. 8). The temperature in warehouse D never rose above − 13 or fell below − 20 degrees centigrade during the entire time the Port Canaveral shipment was there.

While the Wilmington and Port Canaveral shipments were in Santos, Cutrale sent a letter to the captain of the M/V Frio Brazil, instructing him to store the Port Canaveral and Wilmington shipments at − 18 degrees centigrade during the voyage. (Plaintiff's Ex. 6). In response, the ship's refrigeration engineer turned on the reefer refrigeration unit and began pre-cooling the cargo holds. On January 20, the M/V Frio Brazil berthed in Santos and conducted a pre-cooling survey. The pre-cooling survey revealed that the reefer unit was operating satisfactorily and that the ambient air in the holds was − 20 degrees centigrade.

When the ship was ready to receive the Port Canaveral and Wilmington shipments, a Cutrale representative at the vessel contacted the foreman of warehouse D and instructed him to send the pallets. When they were removed from the warehouse, the cartons and pallets were in perfect condition. The warehouse foreman loaded the pallets on rented trucks, eight pallets per truck. Each truck required twenty minutes to load. The trucks then drove to the dock and parked directly underneath the tackle of the vessel. The trip from warehouse D to the dock took fifteen to twenty minutes, and the trucks experienced no delays or other difficulties on this trip.

The ship then loaded the cargo on board and into its holds. While being loaded, the holds were open and warm air seeped inside. In addition, the crew often had to stop loading and wait for suitable cargo.[3] During brief delays, the hatches remained open; for longer delays, they were closed. Nevertheless, the ambient air temperature for all holds in which the Port Canaveral shipment was stored remained below − 14.2 degrees centigrade throughout the loading process.

The cargo space of the M/V Frio Brazil is divided into four levels: A, B, C, and D. Three hatches, labelled 1, 2, and 3, provide access to each level. Each cargo hold is designated by a level and hatch number (e.g., D–1). The Port Canaveral and Wilmington shipments were separated and placed into holds C–1, C–2, C–3, D–1, and D–2. Hold C–1 contained 106 pallets of Cutrale Minute Maid and Margate concen-

---

**3.** The crew rejected warm cargo on three occasions. On January 20, a pallet of Cutrale concentrate was left on the deck of the ship overnight. The next day, a crewman measured the temperature of the orange juice concentrate inside one of the tetrapacks at 22 degrees centigrade. (Plaintiff's Exs. 6, 13, & 14). On January 22, cargo offered for loading was "discharged at 23:55 for lack of cargo with the [proper] temperature." Consequently, the vessel was "awaiting cargo with temperature adequate for shipment." (Plaintiff's Exs. 22 & 23). On January 23, the chief officer noted in his log that cargo designated for hold C–3 was too warm.

trate from the Port Canaveral shipment and 958 drums of Fruitropic orange juice concentrate. (Plaintiff's Ex. 16).

Hold C-2 was a split hold; it contained pallets from both the Port Canaveral and Wilmington shipments. The Port Canaveral side of hold C-2 contained 625 drums of Fruitropic orange juice concentrate, 398 drums of Maguary pineapple juice, 40 drums of nonconcentrated Maguary passion fruit juice, and 24 pallets of Cutrale Margate in tetrapacks. Each drum of passion fruit juice contained at least 190 kilograms of juice. The Wilmington side of hold C-2 contained 1244 drums of Central Citrus concentrate, 32 pallets of Cutrale Sunfilled and 5 pallets of Cutrale Sunshine concentrate. The pallets were stowed against the wall of the hold opposite the Port Canaveral shipment. Three hundred twenty-eight drums of the Central Citrus cargo lay between the Cutrale Sunfilled and Sunshine pallets and the Fruitropic drums bound for Port Canaveral.

All of the cargo in hold C-3 was destined for Port Canaveral. This hold contained 133 pallets of Cutrale Margate, Minute Maid, and Sunfilled concentrate. These pallets were stowed on top of 208 drums of Fruitropic orange juice concentrate, 140 drums of Cargill frozen pineapple juice, 339 drums of orange oilphase, and 109 drums of orange waterphase. Hold D-1 also contained cargo destined exclusively for Port Canaveral. In hold D-1, 41 pallets of Cutrale Minute Maid concentrate were loaded on top of 910 drums of Fruitropic orange juice concentrate. The final hold, hold D-2, contained only Wilmington cargo, including the remaining pallets in the Wilmington shipment. In addition to 16 pallets of Minute Maid concentrate and 27 pallets of Cutrale Sunshine concentrate, hold D-2 contained 1,973 drums of Cargill and Central Citrus concentrate. To use all the space in the holds and to avoid double-stacking the pallets, all of the pallets in the Port Canaveral and Wilmington shipments were packed on top of drums belonging to these other orange juice processors.

The M/V Frio Brazil then issued bills of lading and mate's receipts of the bills of lading for both the Port Canaveral and Wilmington shipments. The bills of lading for the Port Canaveral shipment, numbered 01R, 02R, and 03R, verified that the M/V Frio Brazil received 304 pallets containing 22,800 cartons of frozen orange juice concentrate tetrapacks destined for Port Canaveral (Plaintiff's Exs. 4 & 5). Bills of lading 01R, 02R, and 03R also stated that the cargo was loaded "clean on board" and that the concentrate should be "stowed in refrigerated chambers at − 18 degrees centigrade." (Plaintiff's Ex. 5).

The M/V Frio Brazil finished loading cargo and departed for Wilmington and Port Canaveral on January 27. Throughout the voyage, the ship operated its reefer unit, which is designed to maintain, not decrease, the existing temperature of cargo. The ship's refrigeration engineer recorded the temperature of air delivered into the cargo holds (air delivery temperature) and the temperature of air returned from the holds (air return temperature) four times a day. According to the reefer log, the air return and delivery temperatures of the holds in which the Port Canaveral shipment was stored ranged between − 17.9 degrees centigrade and − 22.1 degrees centigrade throughout the voyage.

The M/V Frio Brazil berthed in Wilmington, Delaware, on February 9 and began discharging its cargo. While the cargo was being unloaded, the temperature in hold C-2 briefly rose to − 14.7 degrees centigrade on February 10 and to − 15.2 degrees centigrade the next day, but decreased immediately after the shipment was unloaded and the hatch was closed. The other holds containing the Port Canaveral shipment remained closed during the unloading procedure in Wilmington and the temperatures, therefore, were unaffected.

On arrival in Wilmington, only two out of the 1,200 cartons of Minute Maid were physically damaged. The damage was higher for the Sunshine and Sunfilled. Out of 4800 cartons that were shipped, 158 were damaged or missing. The undamaged concentrate was eventually sold in Canada, and Coca–Cola received no complaints about the quality of these products. After discharging its cargo in Wilmington,

the M/V Frio Brazil continued to Port Canaveral. It arrived there on February 14 and began unloading the Port Canaveral shipment on February 16. The warehouse manager for Mid–Florida Freezer was at the dock waiting for the concentrate. When the Port Canaveral shipment was unloaded, he noticed that the cartons had suffered extensive physical damage. He immediately contacted the managing partner of Mid–Florida Freezer.

The managing partner went to the dock and surveyed the damage. Several cartons had been pilfered, torn, and punctured. Condensation had formed on the cartons. The concentrate had melted and was leaking out of the tetrapacks and cartons. Despite being restrained by plastic straps, the cartons had collapsed. The warehouse manager and the managing partner randomly selected six pallets and measured the temperature of concentrate from twelve tetrapacks. The samples were all above − 18 degrees centigrade. To protect his company from liability, the managing partner notified the local Coca–Cola distribution manager, the master of the M/V Frio Brazil, Lomar Shipping, Ltd., and the stevedoring company that the shipment arrived damaged and that Mid–Florida Freezer was disclaiming liability. (Plaintiff's Ex. 30 & Defendant's Ex. 1). Later, he sent a similar letter to the United States Customs Service. (Plaintiff's Ex. 34).

The Coca–Cola distribution manager arrived at the dock a few hours later to survey the damage and to watch the remaining cargo being discharged.[4] He measured the temperature of additional samples at − 10 to − 13 degrees centigrade. Based on his observations of the physical damage, he estimated that sixty to seventy percent of the pallets held cartons that had suffered physical damage. Normally, only one-tenth of one percent of the pallets contain damaged cartons.

The Port Canaveral shipment was then deposited in Mid–Florida Freezer's refrigerated warehouse. The temperature of the ambient air ranged between − 18 and − 20 degrees centigrade. In the past, Mid–Florida Freezers has separated damaged from undamaged cartons and restacked the undamaged cartons on good pallets. On this occasion, however, all observers agreed that the physical damage was so pervasive that restacking would be fruitless.

On April 27, Coca–Cola selected six tetrapacks from the Port Canaveral shipment to test for temperature abuse. These samples represented the entire shipment. On April 28, Coca–Cola conducted gel, separation, and flavor tests on each sample. All samples failed the gel test. (Plaintiff's Ex. 32). Four of the six samples failed the separation test. (Plaintiff's Ex. 32). Three of the six samples failed the flavor test. (Plaintiff's Ex. 32). No samples passed all three tests for quality. Based on the results of these tests and the physical damage, Coca–Cola rejected the Port Canaveral shipment. When it received authorization from the United States Customs Service, Coca–Cola instructed Mid–Florida Freezer to dump the concentrate in the Brevard County dump. (Plaintiff's Exs. 27 & 42). In May, Mid–Florida Freezer dumped the concentrate and billed Coca–Cola for its expenses.

Coca–Cola paid Cutrale $343,836.00 for the concentrate and paid Lomar Shipping, Ltd., $49,392.10 for the freight expenses. (Plaintiff's Ex. 43 & 45). Coca–Cola also paid Mid–Florida Freezer $4,582.00 for backhauling the Port Canaveral shipment from the dock into the warehouse and for storing it there for ten days. (Plaintiff's Ex. 26). In addition, Coca–Cola paid Mid–Florida Freezer $4,356.68 for extra storage time, and $9,977.37 for dumping the concentrate. (Plaintiff's Ex. 25, 26, 36, 40, & 41). Coca–Cola then filed an insurance claim with INA, its insurer, for $412,889.51, (Plaintiff's Ex. 48, 49; Defendants Ex. 2), which represented the loss amount, freight charges, and a five percent administrative fee. (Plaintiff's substituted Ex. 48). INA paid Coca–Cola $412,889.51 on June 22,

---

**4.** On arrival, the distribution manager also called Captain Hughes, a marine surveyor, to document the damage. Because Captain Hughes's report contradicts all of the other testimony, the court rejects his report and deposition as untrustworthy.

1988. (Plaintiff's Ex. 50). INA now exercises its subrogation rights against Lomar Shipping Ltd., Seabridge Shipping, Ltd., and the M/V Frio Brazil.

## II. Conclusions of Law

■ The Carriage of Goods by Sea Act (COGSA) governs actions concerning damage to cargo aboard seagoing vessels. 46 U.S.C.A.App. §§ 1300–1315 (West 1975 & Supp.1989). Under section 3 of COGSA, shippers can seek relief from carriers for failing "to exercise due diligence to (a) Make the ship seaworthy; [or] (c) Make the holds, refrigerating and cooling chambers ... in which goods are carried, fit and safe for their reception, carriage, and preservation," or for failing to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." *Id.* § 1303(1), (2). To establish a prima facie violation of section 1303(1) or (2), a shipper or consignee must prove that the carrier received the cargo in good condition and delivered it in damaged condition. *Sony Magnetic Prods., Inc. v. Merivienti O/Y*, 863 F.2d 1537, 1539 (11th Cir.1989); *United States v. Lykes Bros. Steamship Co.*, 511 F.2d 218, 223 (5th Cir.1975); *see also Gilmore, G. & and Black, C., The Law of Admiralty* § 3–43 (1957) (COGSA subsections 3(1) and (2) are the affirmative bases on which a shipper must rely for recovery).

A clean bill of lading serves as prima facie evidence that the carrier received the cargo in good condition. *Terman Foods, Inc. v. Omega Lines*, 707 F.2d 1225, 1227 (11th Cir.1983); *Blasser Bros. v. Northern Pan–Am. Line*, 628 F.2d 376, 381 (5th Cir.1980); 46 U.S.C.A.App. § 1303(4). The bill of lading, however, attests only to the apparent good order of the cargo. 46 U.S.C.A.App. § 1303(3), (4). Accordingly, "because of the perishable or intrinsic nature of the commodity, the internal condition ... [may not be] adequately revealed by external appearances," and the shipper or consignee "may have a considerable burden of going further to prove actual condition." *Compagnie de Navigation v. Mondial United Corp.*, 316 F.2d 163, 170 (5th Cir.1963).

■ Plaintiff INA has established a prima facie case of a violation of section 1303(2). *See* 2A *Benedict on Admiralty, Carriage of Goods by Sea* § 91 (M. Cohen 7th ed. 1989) ("[S]tatutory liability for damage to cargo resulting from improper stowage which does not affect the general safety of the vessel is usually considered to be provided by ... [s]ection 3(2) of the Carriage of Goods by Sea Act"). Although bills of lading 01R, 02R, and 03R stated that the Port Canaveral shipment was loaded "clean on board," the internal condition of the concentrate was not adequately revealed by external appearances. As a result, bills of lading 01R, 02R, and 03R alone establish only that the M/V Frio Brazil received the concentrate in apparent good condition. Other evidence, however, confirms that the concentrate was received in actual good condition.

Cutrale processed and delivered the Port Canaveral shipment in the same manner it has processed and delivered every shipment since 1985. The concentrate passed flavor, gel, separation, and light transmission tests in the Colina laboratory; no evidence of enzyme activity was detected. The concentrate was packaged into tetrapacks, and the tetrapacks were packaged into cartons. The cartons were placed on standard european pallets and secured by six plastic bands, a packaging system regularly used in the past by Cutrale without problems. The shipment was then stored in the Colina refrigerated warehouse at − 24 degrees centigrade, a temperature sufficiently cold to retard enzyme activity, to freeze the concentrate, and to make the tetrapacks and cartons rigid.

The trucks carrying the Port Canaveral shipment from Colina arrived in Santos within twelve hours. Although these trucks were not refrigerated, past experience shows that the temperature of concentrate normally rises only one to two degrees centigrade during this trip. Nothing suggests that the temperature of the concentrate rose more than two degrees on this particular trip.

On arrival in Santos, the Port Canaveral and Wilmington shipments were placed promptly in the Santos refrigerated warehouse. Although the pallets were double-

stacked, plywood between the bottom and top pallets prevented damage to the cartons. Warehouse D was sufficiently cold to retard enzyme activity, to freeze the concentrate, and to keep the cartons rigid. Immediately prior to being loaded aboard the ship, the cartons and pallets were in perfect condition. The pallets were taken to the ship only when it was ready to receive them. Based on the clean bills of lading, Cutrale's history of successfully processing and delivering concentrate to Santos, and the manner in which the Port Canaveral shipment was handled in conformity with this procedure, the court concludes that the Port Canaveral shipment was delivered to the M/V Frio Brazil in good condition.

To complete a prima facie case of a violation of subsection 1303(1) or (2), a shipper or consignee must also prove that the carrier unloaded the cargo in a damaged condition. *Terman Foods, Inc.*, 707 F.2d at 1227; *Lykes Bros. Steamship Co.*, 511 F.2d at 223. The warehouse manager for Mid–Florida Freezer, managing partner of Mid–Florida Freezer, and Coca–Cola distribution manager all confirmed that sixty to seventy percent of the Port Canaveral shipment was physically damaged. Additionally, samples of concentrate taken at the dock revealed temperatures of − 10 to − 13 degrees centigrade. Separation, gel, and flavor tests all verified that the concentrate suffered from temperature abuse. The court concludes therefore, that the ship unloaded the concentrate in damaged condition and that plaintiff INA has established a prima facie case of a violation of section 1303(2).

■ Once the consignee or shipper establishes a prima facie case, the burden shifts to the carrier to rebut this evidence by proving that it exercised due diligence to prevent the damage by properly caring for the cargo or by showing that the damage resulted from an uncontrollable cause of loss. *Sony Magnetic Prods. Inc.*, 863 F.2d at 1539; *Blasser Bros.*, 628 F.2d at 381; 46 U.S.C.A.App. § 1304(2). To rebut plaintiff's prima facie case, defendants presented evidence that the damage resulted from one of two uncontrollable causes

of loss: insufficient packaging and the inherent vice of the concentrate. *See* 46 U.S. C.A.App. § 1304(2)(m), (n). Specifically, defendants claim that using the european pallets and neglecting to enclose each pallet in a cardboard shroud precipitated physical damage to the cartons. According to defendants, the narrower european pallets allowed the ends of the forklift blades to protrude from beneath the pallet and to puncture cartons on other pallets. Additionally, defendants contend that the absence of a shroud allowed condensation to attach directly to the cartons. As a result, the cartons became soggy and collapsed.

Notwithstanding defendants' hypothesis, the court concludes that the packaging was sufficient. Cutrale representatives testified that european pallets were used often and held the cartons together. The managing partner of Mid–Florida Freezer testified that although european pallets are not the best pallets for ocean voyages, they are adequate. Furthermore, Mid–Florida Freezer has received other shipments on european pallets that arrived in good condition. Accordingly, the use of european pallets was a sufficient packaging method.

Similarly, placing cartons on pallets without shrouds served as a sufficient packaging system. Cutrale has shipped tetrapacks on pallets both with and without shrouds since 1976 and has never had a problem with either method. Nevertheless, Coca–Cola believes that the shrouds not only strengthen the pallets, but also retain cold air inside the shroud. Coca–Cola maintains that warm air condenses on the shroud rather than the individual cartons, keeping the cartons dry and strong. Yet, the evidence of physical damage suggests that the cartons collapsed because the concentrate melted, not because the cartons were soggy from condensation. Accordingly, the court concludes that the damage was not caused by the packaging and that the "insufficiency of packaging" defense fails to rebut plaintiff's prima facie case.

■ Defendants also claim that the frozen orange juice concentrate suffered from an inherent vice. As an initial matter, the

834

court concludes that the innate susceptibility of concentrate to enzyme activity and the requirement that concentrate be stored at − 18 degrees centigrade does not endow frozen orange juice concentrate with an inherent vice. According to the fifth circuit:

> The fact that bananas require special care during shipment, due to such characteristics of that cargo as encourage ripening ... is not the circumstance envisioned by [the inherent vice] exculpatory clause. Certainly all parties to the charter party understood the nature of such cargo in general and the special ship characteristics necessary for its transport. Rather, to gain assistance from [the inherent vice] statutory exculpation, the carrier must have shown some defect, quality, or vice adhering to the particular bananas brought aboard.

*Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 435 (5th Cir.1968), *cert. denied*, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969). To establish the inherent vice defense, defendants must show that this particular batch of concentrate suffered temperature abuse before being loaded aboard the M/V Frio Brazil. *See Blasser Bros.*, 628 F.2d at 384; *Vana Trading Co. v. S.S. Mette Skou*, 556 F.2d 100, 103–04 (2d Cir.), *cert. denied sub nom.*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

Defendants claim that the concentrate was exposed to warm air throughout the packaging and transportation process, and they point to several instances to substantiate their claim: when Cutrale moved the concentrate from Colina to Santos, when the Santos warehouse refrigerators were turned off at night and the ambient air temperatures increased, when the pallets were being loaded aboard the M/V Frio Brazil, and when the ship's hatches were opened while the ship's crew awaited properly cooled cargo. According to defendants, the concentrate may have been refrozen in the Santos warehouse, but had already suffered temperature abuse before being loaded on the M/V Frio Brazil.

The court concludes that the exposure of the concentrate to warm air prior to loading was insufficient to stimulate enzyme activity. From the time it was tested in Colina until the time it was loaded aboard the vessel in Santos, the concentrate was handled in a manner identical to past shipments. Although defendants showed that this procedure exposed the concentrate to some warm air, Cutrale has successfully shipped concentrate since 1985 without encountering any temperature abuse problems. Defendant produced no convincing evidence that the Port Canaveral shipment was exposed to extraordinary heat. Furthermore, temperature abuse was not the reason Coca–Cola initially rejected the Port Canaveral shipment. Coca–Cola originally refused the shipment because the cartons had collapsed and the concentrate was leaking out. Because the cartons appeared to be in perfect condition when they were loaded in Santos, the concentrate must have melted while in the possession of the M/V Frio Brazil.

The Cutrale concentrate melted because it was stored with drums of warm Fruitropic concentrate, passion fruit juice, orange waterphase, and orange oilphase. The court concludes that before being loaded aboard the ship, the drums of orange waterphase and orange oilphase were cooled only to their freezing temperatures, − 2 degrees centigrade, and the Fruitropic concentrate and passion fruit juice were thawed altogether. The ship's crew never measured the temperature of the drums and, unlike tetrapacks, drums do not lose their shape if their contents melt. As a result, the ship's crew accepted and stored the drums even though they were well above − 18 degrees centigrade, the freezing temperature of Cutrale concentrate.

Once aboard the M/V Frio Brazil, the drums warmed the tetrapacks and melted the concentrate. Although the reefer unit maintained air delivery and return temperatures between − 17.9 and − 22.1 degrees centigrade, it was incapable of reducing the temperature of the warm drums to − 18 degrees centigrade. In addition, these temperatures did not necessarily represent the temperature of the cargo; they indi-

cated only the degree to which heat was being removed from the hold. Moreover, the stowage plan encouraged heat transfer between the drums and pallets. The spaces between the tightly-packed drums formed channels through which air warmed by the drums flowed upward to surround the cartons on the pallets. The drums and pallets trapped the warm air and prevented it from returning to the air return vent for recooling. Because the warm air was stagnant, the exchange of heat between the warm, trapped air and cold cartons of tetrapacks melted the concentrate, stimulated enzyme activity, and caused the cartons to lose their rigidity.[5]

A comparison of the Port Canaveral and Wilmington shipments supports this hypothesis. The Wilmington shipment was stored in hold D–2 and hold C–2. Hold C–2, the hold containing both Port Canaveral and Wilmington cargo, also contained drums of Fruitropic concentrate and Maguary passion fruit juice.

On arrival, less than two-tenths of one percent of the Minute Maid cartons in the Wilmington shipment were damaged. These cartons were stored in hold D–2 and had no contact with drums of Fruitropic concentrate, Maguary passion fruit juice, orange waterphase, or orange oilphase. In contrast, three percent of the Sunfilled and Sunshine cartons were damaged. All of the Sunfilled cartons were stored in hold C–2 and the Sunshine cartons were split between holds C–2 and D–2. Although the cartons in hold C–2 shared the hold with Fruitropic concentrate and Maguary passion fruit juice, 272 drums of properly cooled Central Citrus concentrate lay between the Wilmington shipment and the warm drums, partially insulating the tetrapacks from heat. In contrast to the Wilmington shipment, every pallet in the Port Canaveral shipment was stacked on or near drums of Fruitropic concentrate, Maguary

passion fruit juice, orange waterphase, or orange oilphase, and sixty to seventy percent of the pallets in the Port Canaveral shipment suffered some damage.

Additional evidence suggests that the M/V Frio Brazil loaded warm drums. Drums of passion fruit juice normally contain only 180 kilograms, less than their full capacity. When the passion fruit juice freezes, it expands and fills the drums to capacity. Each drum of passion fruit juice in the Maguary shipment, however, contained at least 190 kilograms of juice. If the passion fruit juice inside had been frozen, the drums would have bulged or ruptured. The chief officer's log, the reefer log, and the loading tally sheets, however, never mention that any drums of passion fruit juice were ruptured or bulging. Because the drums contained 190 kilograms of juice and were not ruptured or bulging, the juice could not have been frozen.

Although defendants concede that the tetrapacks would become soft if loaded on top of warm drums, they claim they are not responsible for the damage. Defendants claim that Cutrale knew that raw concentrate froze at $-9$ to $-10$ degrees centigrade and still requested that their tetrapacks be loaded on top of drums of raw concentrate. Yet, Cutrale requested that its tetrapacks be loaded on top of drums to avoid double-stacking the pallets. Nevertheless, defendants were aware that concentrate must be remain frozen during the voyage; the bills of lading and Cutrale's letter to the M/V Frio Brazil specified that the Port Canaveral shipment must be stored at $-18$ degrees centigrade. Because raw concentrate, non-concentrate fruit juice, orange waterphase, and orange oilphase can be stored at $-18$ degrees without damage, the ship still should have stored all cargo at $-18$ degrees centigrade. *See The Mangalia*, 69 F.Supp. 688, 692–93 (S.D.N.Y.1946). Moreover, the court concludes that the Cutrale concentrate melted because the Fruitropic concentrate was warm, not because it was

---

**5.** Dr. Proctor, an expert witness in thermodynamics, testified on the effect of storing drums of warm raw concentrate with frozen finished concentrate in tetrapacks. He evaluated the refrigeration capacity of the reefer unit, the mass of the concentrate in drums, the mass of concentrate in tetrapacks, and the temperature of the tetrapacks on loading. He assumed that

the Fruitropic drums contained concentrate at 18 to 22 degrees centigrade and opined that warm concentrate in the drums would increase the temperature of the concentrate in the tetrapacks to $-7.5$ degrees centigrade in hold C–2 and between $-12$ and $-3$ degrees centigrade in hold C–3.

frozen at − 9 to − 10 degrees centigrade. Because defendants failed to show that the Cutrale concentrate suffered from temperature abuse before being loaded aboard and failed to rebut the evidence that the drums of Fruitropic concentrate, passion fruit juice, orange waterphase, and orange oilphase were warm, the inherent vice defense is inadequate to rebut plaintiff's prima facie case.

■ If a carrier is unable to rebut a plaintiff's prima facie case, it becomes liable "for the entire damaged cargo unless it can prove what portion was not actually damaged or was damaged under one of the exceptions of [section] 1304(2)." *Blasser Bros.*, 628 F.2d at 382. In this case, defendants failed to rebut plaintiff's prima facie case of a violation of section 1303(2) and failed to show that the cargo was damaged as a result of inherent vice or insufficient packaging. Defendants also failed to show that some of the concentrate was not damaged. Sixty to seventy percent of the pallets in the Port Canaveral shipment contained cargo that suffered from physical damage. The gel, separation, and flavor tests confirmed that the entire shipment suffered from temperature abuse. Although Mid–Florida Freezer has segregated and restacked undamaged cargo on new pallets in the past, all witnesses confirmed that on this occasion, the damage was so pervasive that restacking would be fruitless. Accordingly, the entire Port Canaveral shipment was damaged and defendant is fully liable for it.

■ Defendants seek to invoke section 4(5) of COGSA, which imposes a $500.00 per package limitation on damages. 46 U.S.C.A.App. § 1304(5). They claim that the pallets, rather than the cartons, were the relevant "packages" for the purposes of COGSA. Defendants contend, therefore, that the Port Canaveral shipment consisted of 304 packages, and that the total amount of damages should be limited to $152,000.00. In contrast, plaintiff argues that the cartons constitute the COGSA "package."

Notwithstanding defendants' contentions, the cartons are the relevant "package" for the purposes of section 1304(5). Bill of lading 01R, for example, listed the concentrate as "160 PALLETS CONTAINING: 12,000 (TWELVE THOUSAND) CARTONS WITH 12 PACKAGES OF 1,000 ML EACH ONE CONTAINING FROZEN CONCENTRATED ORANGE JUICE." To the extent this description of "package" is ambiguous, the ambiguity must be resolved in favor of the shipper or consignee. *Sony Magnetic Prods., Inc.*, 863 F.2d at 1541–42; *Vegas v. Compania Anonima Venezolana de Navegacion*, 720 F.2d 629, 630–31 (11th Cir.1983). Consequently, the cartons are the "package" for the purposes of section 4(5) of COGSA, and the $500.00 per package liability limitation is inapplicable.

■ Under COGSA, the measure of damages is the "market value of the cargo in sound condition at its destination less its market value in its damaged state." *Terman Foods, Inc.*, 707 F.2d at 1228. When the market value is uncertain, as it is in this case, courts may use the invoice price. *Id.* The invoice price of the Port Canaveral shipment was $343,836.00. The concentrate in its damaged state was worthless; the measure of damages is, therefore, the invoice price of $343,836.00. In addition, the court grants plaintiffs its expenses for backhauling the shipment into Mid–Florida Freezer's warehouse ($4,582.00), storing the concentrate in Mid–Florida Freezer until May ($4,356.68), and dumping the concentrate at the Brevard county dump ($9,977.37), which equals a total of $362,-752.05.

Accordingly, the court holds defendants liable to plaintiff for a $362,752.05 plus prejudgment interest from the date of delivery to Port Canaveral at the rate established by 28 U.S.C.A. § 1961 (West Supp. 1989). *See Complaint of M/V Vulcan*, 553 F.2d 489, 491 (5th Cir.), *cert. denied sub nom.*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977); *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029 (5th Cir.1986).

It is SO ORDERED.